Filed 10/23/13  P. v. Xiong CA5

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent<br><br>    v.<br><br>MOUA XIONG,<br><br>    Defendant and Appellant. | F062259<br><br>(Super. Ct. No. VCF203527A)<br><br>**OPINION** |
| THE PEOPLE,<br><br>    Plaintiff and Respondent<br><br>    v.<br><br>YER THAO MOUA,<br><br>    Defendant and Appellant. | F062262<br><br>(Super. Ct. No. VCF203527B) |
| THE PEOPLE,<br><br>    Plaintiff and Respondent<br><br>    v.<br><br>CHOU XIONG,<br><br>    Defendant and Appellant. | F062263<br><br>(Super. Ct. No. VCF203527C) |

THE PEOPLE,

       Plaintiff and Respondent

            v.

LINDA MOUA,

       Defendant and Appellant.

F062264

(Super. Ct. No. VCF203527D)

-ooOoo-

APPEALS from judgments of the Superior Court of Tulare County.  Patrick J. O'Hara, Judge.

Nuttall Coleman & Wilson, Nuttall & Coleman, Roger T. Nuttall and Glenn M. Kottcamp for Defendants and Appellants.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Julie A. Hokans and Galen N. Farris, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

A jury convicted appellants Moua Xiong, Yer Thao Moua, Chou Xiong, and Linda Moua (collectively defendants) of two counts of insurance fraud (Pen. Code, § 550, subd. (a)(1))[1] and one count of conspiracy to commit insurance fraud (§ 182, subd. (a)(1)).  The convictions were based on insurance claims made for medical bills after an automobile collision.

On appeal, defendants contend they were entitled to a judgment of acquittal after the close of the prosecution's case.  Moua Xiong and Yer Thao Moua also argue that

---

[1]Subsequent statutory references are to the Penal Code unless noted otherwise.

2.

their convictions were not supported by substantial evidence.[2]  We disagree and affirm the judgments.

## FACTUAL AND PROCEDURAL SUMMARY

As the defendants contend the prosecution failed to prove its case and two defendants contend their convictions were not supported by substantial evidence, we describe the trial in some detail.

### *The charges*

The Tulare County District Attorney alleged in an information that all four defendants "did aid, abet, solicit, conspire with another and did knowingly present and cause to be presented . . . false and fraudulent claim[s] for the payment of a loss and injury" to Allied Insurance Company (Allied) (count 1) and Geico Insurance Company (Geico) (count 2).  Count 3 alleged that defendants conspired "together and with another person and persons whose identity is unknown to commit the crime of INSURANCE FRAUD," committing the following overt acts:  "1. Obtained medical treatment[;] 2. Submitted medical claims for payment to GEICO[;] 3. Executed powers of attorney."

A jury trial for all four defendants began on October 4, 2010.  The trial court described its understanding of the case before the trial started:  "[T]his is a traffic accident and the People allege that two defendants were in the car and the defendants indicated there are more than two."  The prosecutor and Yer Thao Moua's attorney agreed this was the crux of the case.[3]

---

[2]Both parties refer to defendants by their first and last names throughout their briefs.  Because two pairs of defendants share last names and one defendant's first name is the same as two other defendants' last names, for clarity, we also will refer to defendants by their first and last names.

[3]Defendants had separate attorneys during the trial.  Moua Xiong was represented by Paul Storey, Yer Thao Moua by Albert Gordon, Chou Xiong by Mary Jarvis, and Linda Moua by Robert Bartlett.

*Prosecution's evidence*

Mark Stearns testified that he witnessed the collision. He lives in Las Vegas, and in October 2007 he was in Fresno with his motorcycle club for a motorcycle event. His wife Tracy and their two children also were with him in Fresno. Around 9:00 or 10:00 in the morning on October 6, 2007, his motorcycle club was on its way to breakfast. There were about 16 to 20 people; everyone was on a motorcycle except his wife Tracy. She was driving a rental van and the children were with her. Tracy had not rented the van and was not on the rental agreement, but she had permission to drive it from Randy Harvey, who had rented the van in Las Vegas to tow his motorcycle to Fresno.

That morning Mark was acting as a road captain. He explained that road captains block cross traffic so their motorcycle caravan can get through an intersection, even if the traffic signal turns red before everyone in the group has cleared the intersection. Before the collision, Mark was in the middle of an intersection on his motorcycle, blocking a bus that was in the left-turn lane of the street perpendicular to the street on which the caravan was traveling. He did not know the names of the streets, but other testimony indicates the collision occurred in the intersection of Fresno Street and "O" Street, with the motorcycle caravan traveling south on "O" Street and Moua Xiong's 1991 Toyota Previa headed east on Fresno Street.

According to Mark, there were three road captains or blockers at the intersection -- Mark and another road captain were blocking the cross traffic to the right of the caravan, and a third road captain blocked cross traffic to the left of the caravan. As the motorcycles were going through the intersection, the traffic light facing them was green. Not everyone in the group cleared the intersection before the light turned red, however; Tracy, who was driving the rental van, did not make it through the intersection.

The light for the cross traffic turned green, but Mark was blocking a bus in the left-turn lane, while another road captain on a motorcycle was blocking two other lanes of traffic. A minivan proceeded into the intersection between Mark and the other road

4.

captain. The minivan ran into the rental van Tracy was driving, hitting it on the passenger side. Tracy had entered the intersection when her light was red, and the minivan had the green light. Mark signaled for the other road captain to get Harvey, who had rented the van, and Ferrer Vincent, who was another road captain.

After the collision, Tracy and the driver of the minivan went through the intersection and parked on the side of the road. Mark got off his motorcycle, took off his helmet, and went to Tracy's van to make sure she and the children were okay. They were fine. Tracy and the children had gotten out of the van.

Next, he went to the minivan to make sure the occupants were okay. Mark could not identify the driver as any of the defendants, but he described the driver as "oriental with black hair" and around five feet two inches to five feet four inches tall. There were two women in the minivan. The driver got out and walked around the front of the car to see the damage. The woman in the front passenger seat got out and stood to the side.

Mark asked if they were okay, and the driver said yes. He spoke to her in English. The driver asked if his kids were okay, and Mark said yes. She asked if he was the owner of the van, and he explained it was a rental. Mark and Tracy exchanged insurance and driver's license information with the driver. Asked whether he was able to converse freely in English with the driver, Mark responded, "It was, yes. Yes, no, or okay. So yes." He also described the driver and passenger as speaking "broken" English.

At some point, a woman stopped at the scene and helped translate for Tracy and the driver. (Mark did not know who she was, but at trial the translator was identified as Maysee Yang.) He believed the exchange of information had started before the translator arrived. Mark thought the translator pulled over within five or 10 minutes of the collision and she parked in front of both vehicles.

Mark had a camera and took photos to document the damage to the vehicles from the collision. The collision did not leave any debris on the ground, and Mark described the damage to both cars as minor. The damage to the minivan was on the lower part of

the bumper on the driver's side. At one point while taking photos, Mark stood in front of the minivan and looked through the windshield. He could see directly through and saw no one inside. He also saw the inside of the minivan when the driver opened the sliding door on the passenger side to retrieve her purse. Mark saw no one inside the minivan. While Mark was taking photographs, Tracy was talking to the driver and the translator.

Vincent and then Harvey arrived at the scene. Mark thought they arrived within two or three minutes of each other, and Harvey arrived about 10 or 15 minutes after the collision. Harvey and Tracy spoke with the translator.

After the exchange of information, everyone left the scene of the collision. Mark testified that the police were not called. Tracy got into the rental van with the children and the people from the minivan got back into their car. Mark believed Tracy drove off first and then the driver of the minivan. He also saw the translator get into a car and make a right turn. He thought from the time of the collision until everyone left was about 45 minutes.

Tracy testified that she was driving the rental van on the morning of the collision. She drove through a red light because she was following the motorcycles in her group. A minivan bumped her on the right side. The collision "kind of just rocked [them]," and it was "not a big impact." She and her children were not injured from the impact.

Tracy saw only one person get out of the minivan -- an Asian woman with short hair. Tracy was not paying attention when the woman got out of the minivan and could not say whether she was the driver or a passenger. Tracy and the woman exchanged information. Initially, Tracy gave information from Budget that she retrieved from the rental van's glove compartment, but she also gave insurance information for her own carrier, Geico. Another Asian woman (Yang) was translating because the woman from the minivan did not understand. Tracy did not know where the translator had come from, but she appeared on the scene "really fast," perhaps within two or three minutes. Tracy remembered seeing only these two people, the woman from the minivan and the

translator. She did not look into the minivan. She did not hear any voices or noises coming from the minivan. Tracy did not remember seeing Harvey or Vincent at the collision scene. She thought the whole process of stopping and exchanging information took less than 10 minutes.

Vincent is from Las Vegas and was in Fresno for the motorcycle event. Twenty or more people from his motorcycle club attended the event. Vincent testified that he did not see the collision as he was at the front of the motorcycle caravan. He was a road captain, and it was his job to make sure everyone was safe. He was told there was a collision, and he turned around and went to the scene.

When Vincent arrived, the vehicles involved in the collision were already pulled over and the drivers had gotten out. He checked to make sure everyone was okay. He asked the women in the other vehicle if anyone was hurt or needed medical attention and called for police assistance. Another woman (Yang) also had stopped at the scene of the collision. This woman was translating because "the two that [were] in the other vehicle that struck Mrs. Stearns' van, they didn't understand too well." Vincent thought the translator arrived close to the time he did because he saw her getting out of her car as he was arriving. With the help of the translator, he again asked if anyone was hurt and everyone said they were fine and they did not need medical assistance.

Vincent saw two women from the minivan that hit Tracy's van. He did not see anyone else get out of the minivan. He walked around the minivan and looked through the windshield and did not see anyone else. He did not hear any voices or noises coming from the minivan. The passenger door was open, but he did not think the sliding door was open.

Vincent contacted the police, but they did not come to the collision scene. He testified that the police "said they were more or less overwhelmed with all the other motorcycle clubs going on in the area" and told him the drivers should exchange

7.

information as best they could. He looked at the minivan for damage and thought it was not significant. He also inspected the rental van Tracy was driving.

Vincent thought he was at the collision scene for roughly 15 to 20 minutes. He could not remember whether Harvey was there. Vincent left the scene with Mark and they left before the minivan did.

Harvey also is from Las Vegas and was in Fresno for the motorcycle event. He testified that he rented a van in Las Vegas and drove it to Fresno with his motorcycle on a trailer. In Fresno he rode his motorcycle, and he gave Tracy permission to drive the van.

On the morning of the collision, Harvey was already seated at a restaurant when someone came in and told him Tracy had been involved in a collision. He rode over to the scene with Vincent. When he arrived, the cars were parked and people were out of their cars. Tracy was on the sidewalk, but her two children were in the rental van. The people from the other vehicle were an Asian woman and a girl, and they were standing on the sidewalk. The girl appeared to be about seven or eight years old to Harvey. Another Asian woman (Yang) was translating; Harvey thought she worked for the city or county. Harvey tried to talk to the driver, but she did not know what he was talking about. Through the translator, Harvey told the driver everything was fine and he had insurance. He asked if everyone was fine and they said yes.

Harvey looked at damage to the rental van and realized the collision had not really been that bad. It appeared the damage would only cost a couple hundred dollars. He also walked around the other car, which had sustained even less damage. He said, "[A]ll you have to do is paint the bumper core and that was it." When he walked around the other car, he could see inside and there was nobody there. He saw that Tracy's kids were crying and shaken up from the collision, but he did not hear any crying coming from the other car. Harvey knew that the woman and the girl were from the other car involved in the collision because after everyone exchanged information, he saw them get in the car

and drive away. He also saw the translator walk away. He was at the collision scene for about 15 to 20 minutes.

Yang, who acted as translator after the collision, is fluent in Hmong, Laotian, and English and works for the Fresno County Department of Social Services (adoption). On October 6, 2007, she was working, driving a county car to transport a child to an appointment. Prior to the collision, Yang was on Fresno Street headed west, and Moua Xiong's minivan was on the other side of the intersection headed east. She saw the collision and pulled over "because it was unusual that my light was green, but there was a gentleman who was blocking the street." She spoke to both drivers involved in the collision, in English with one and in Hmong with the other. Yang testified that one of the drivers "look[ed] like a typical Hmong"[4] and she assumed that the driver spoke Hmong. Yang translated and helped the drivers exchange information. She also spoke to the man who had been blocking the street. She was not sure if he was on a motorcycle. These were the only three people she spoke to directly.

Both drivers had gotten out of their cars when Yang spoke to them. Yang did not remember if anyone else got out of the Hmong-speaker's car. She did not remember speaking to anyone else. She testified that as the collision occurred, she saw into the Hmong-speaker's vehicle and saw "several people in the car." She testified, "[I]t is a typical, you know, looks like a typical Hmong car with people -- you know, a lot of people in there." Asked how many, Yang responded, "I don't know how many, but I know I saw several people like in the cars." When she pulled over and translated for the drivers, she did not look into their cars, but she had "a feeling that both car[s had] people in there." Yang believed people had come out of both cars, but she was not paying attention because she was talking with the drivers. She explained, "I have a feeling that

---

[4]Yang explained, "I mean it is hard to explain but, you know, when you live the culture all your life, it is like a typical Hmong woman who [doesn't] speak a lot of English, the way she dress[es] or, you know, how she look[s] …."

9.

both cars have people in the cars . . . because they were like people around me, you know, trying to share the information and the Hmong speaking car like I said . . . it is just a typical car that when I drove by, you know, but I didn't actually, I don't think they come out, all of them come out of the car."

Yang recalled that she turned around and came back to the scene. At that point, the rental van had already pulled over, and Yang parked in front of the rental van. The Hmong-speaker's car had not moved and was still in the middle of the street. She told them they needed to move and they parked behind the rental van.

Fresno Police Officer David Unruh testified that on October 6, 2007, he was notified there had been a collision at Fresno Street and "O" Street. He went to that location at approximately 12:45 p.m. One car was still there. Unruh spoke to an Asian man. He could not recall if anyone else was there. He did not generate a police report because it is department policy not to write a police report for a noninjury traffic collision. Unruh asked the man if anyone had been injured and he said there were no injuries.

Wadoua Xiong testified that he speaks English and Hmong. Moua Xiong, who is his niece, does not speak English very well. He learned of the traffic collision when Moua Xiong and her husband Tong Moua called him a day or two after the collision. They needed Wadoua to translate for them and asked him to contact their insurance company.[5] Wadoua explained that he would help anyone in the Hmong community with translating.

When he first called Allied, he was told they could not speak to him about the claim until Moua Xiong gave permission for him to speak on her behalf. Wadoua met with all four defendants at one time at Moua Xiong's house, and they all asked him to

---

[5]Because Wadoua Xiong shares a last name with two of the defendants, we refer to him by his first name.

speak to the insurance company on their behalf. He bought a form from the store and had defendants sign it. He testified that he explained the form to the four defendants in simple terms: "I just give them simple like as you sign this that means you will give me permission to speak with your insurance and represent you to talk to them."

Wadoua testified that Moua Xiong told him to report to Allied that they were in a collision and needed to go to the doctor. Allied told Wadoua to contact the other party involved in the collision directly, but he was unsuccessful in trying to find the other driver. Later, around January 2008, Allied called Wadoua with information about the other driver's insurance company, Geico. Wadoua was told that he just needed to contact Geico and they would take care of his niece's case.

The four defendants signed a document giving Wadoua permission to speak to Geico on their behalf. In addition, Tong Moua signed a form allowing Wadoua to speak on behalf of Gaohnou and Pang (Moua Xiong's children), and Linda Moua signed a form allowing him to speak for her daughter Michelle. Wadoua contacted Geico on behalf of the four defendants to seek payment for their medical bills. Wadoua's purpose in calling Geico was to have Geico compensate Allied for the medical bills Allied had already paid.

Lani Chevoya testified that she works for Allied inspecting vehicles for damage. She inspected Moua Xiong's minivan for damage after the collision. The damage was on the bumper, and the repair cost was approximately $300, below the insured's deductible.

Ralph Edwards investigates suspicious insurance claims for Allied and other insurance companies. He testified about Allied's claim file for its insured, Moua Xiong, involving a traffic collision that occurred in Fresno on October 6, 2007. Allied received claims from seven claimants for medical bills totaling $8,396.86. The claimants were the four defendants and three children -- Linda Moua's daughter, Michelle Moua, and Moua Xiong's children, Gaohnou Moua and Pang Moua. Allied paid the claim amount directly to the treatment provider, chiropractor Ronald Ybarra.

11.

John Palisoc, a senior security investigator at Geico, testified that a claim existed for Tracy Stearns, who was the other driver in the collision. She had received a demand from Allied.

### Section 1118.1 motion

At the close of the prosecution's case, Yer Thao Moua's attorney stated that he wanted to make a motion pursuant to section 1118.1. Moua Xiong's attorney added that he wanted to make a motion in regard to count 2, specifically. He argued there was no evidence that an insurance claim had been made for pain and suffering. Chou Xiong's attorney joined in the motion as to all counts, and Yer Thao Moua's attorney stated, "I concur."

The prosecutor argued that whether the false claim made to an insurance company was for medical bills or for pain and suffering made no difference; the falsity of the claim "lies in the fact that there were not 7 people in the car, there were only 2 people." Aside from the statement regarding count 2, defendants' attorneys made no argument in support of the motion for judgment of acquittal. The trial court denied the motion, explaining, "The issue is whether there was a false claim made and for the reasons stated by the prosecution, the 1118.1 motion is denied."

### Defense evidence

Moua Xiong testified that she had children but could not remember how many.[6] Her younger children are Gaohnou and Pang, but she could not remember how old they were. She had recently had a medical condition and surgery, which caused her not to recall things well. She did remember that on October 6, 2007, she was in Fresno at a relative's funeral. At some point, she left the funeral with six others to get something to eat. Moua Xiong drove her minivan. Yer Thao Moua was next to her, Linda Moua was

_____

[6]Moua Xiong testified using an interpreter. Linda Moua, her daughter Michelle, and Moua Xiong's children, Pang and Gaohnou, also used interpreters when they testified.

behind Moua Xiong, and Chou Xiong was behind Yer Thao Moua. There were three children in the back, Gaohnou, Pang, and Michelle.

Recalling the collision, Moua Xiong testified that she had the green light and "there was one coming from the other side, before I knew it I had slowed but we hit each other." Her minivan was "stuck with" the vehicle. Yang noticed they were Hmong and talked to them. Yang told Moua Xiong to back up so they would be able to move to the side. Moua Xiong gave her insurance information to Yang, and Yang gave her the information from the other people involved in the collision. Moua Xiong did not recall what time of day it was or what the weather was like. If Yang had not asked her to move her car, she would have remained there until the police came. Moua Xiong did not check on her children, and she did not know if they were crying. She got out of her car and talked to Yang. She testified that only Yang spoke to her, and nobody else spoke to her.

Asked whether she felt like she had been hurt, Moua Xiong responded that she was too frightened to feel hurt. She noticed pain later. She went to the doctor but could not recall how long it was after the collision. She also took Gaohnou and Pang to the doctor. They complained of neck and back pain. She did not recall how long the treatment lasted, and she did not know if she contacted her insurance for treatment. Wadoua set up the doctor's appointments for them. All four defendants went to the same clinic for treatment. She did not know how they all decided to go to the same clinic.

Moua Xiong testified that she did not contact her insurance company as she does not speak the language. Asked if she had Wadoua call her insurance company for her, she responded, "I don't know." She did recall signing a form. Asked why she signed the form, she responded, "Because my insurance has coverage, there is coverage and I don't speak the language so [Wadoua] speaks the language."

Linda Moua testified that she was in the minivan with Moua Xiong. There were seven people in the minivan, including her daughter, and they were going to the store. They were in a collision, and, as a result, she went to a chiropractor for treatment. She

testified that she did not get out of the minivan until her husband came to the scene. They were all there when the police arrived.

Pang was 11 years old at the time of the trial. He testified that he remembered going to a funeral in Fresno for an uncle and they went to get something to eat. He was in his mother's car with Linda Moua, Chou Xiong, Yer Thao Moua, his mother, Gaohnou, and Michelle. The car had three rows and he was in the third row in the back wearing a seatbelt. He was eight when the collision happened. He could not see through the front windshield. After the collision occurred, he stayed in the car. His mother got out of the car. He did not remember if anyone else got out of the car. He did not remember if his mother ever opened the door to the car. He did not remember whether he saw the other driver or anyone else. He did not remember if anyone talked to his mother or if anyone walked around their car. He saw a man on the sidewalk on a motorcycle. He did not remember if that man spoke to his mother. He did not feel pain then, but when he got home his back and neck started to hurt.

Gaohnou was 10 years old at the time of the trial. She testified that she went with her mother and brother to a funeral in Fresno. They left in her parents' van. There were seven people in the van, including her mother and three other adults. She sat in the back of the van. She said there was a collision "because our direction was green light and theirs was a red light, we went and there is a car accident." According to Gaohnou, after the collision she "went outside." She testified that Yang asked them to move their car. The prosecutor asked if she saw any motorcycles, and Gaohnou responded, "They did not look at us." "When they came they did not look at us." Asked who did not look at them, she said, "Police."

Michelle, who was 11 years old, also testified there were seven people in the minivan. She identified Moua Xiong as the driver and Yer Thao Moua as "the one who sits next to the sliding door."

14.

Two witnesses testified they saw seven people in Moua Xiong's minivan before the collision. Nao Tou Moua testified that on October 6, 2007, he was at a church in Fresno because a relative had passed away.[7] He saw four women and three children get into a blue van. Later, he became aware that a collision had occurred. This was about 20 minutes after he saw the blue van leave the parking lot. Another witness, Yia Moua, similarly testified that he was at a funeral and saw four women and three children leave in a minivan. He identified defendants as the women in the minivan. He did not recall any other people getting into their cars that day, and he could not remember with whom he was standing when he saw the minivan. He learned about the collision while he was still at the funeral.

Ybarra is a chiropractor. He testified about treating all four defendants and the three children. All seven began treatment on the same day, October 10, 2007. Yer Thao Moua, for example, complained of neck and low back pain, and her treatment plan included manual manipulation of the cervical mid and lower back, electrical muscle stimulation, and therapeutic massage. She received 17 treatments, and her treatment ended on December 5, 2007. She improved gradually, and her course of treatment was typical for patients who have been in an automobile collision. Ybarra submitted his bills directly to, and received payment directly from, the insurance company. Defendants all had the same type of injuries. Ybarra's understanding was the injuries were related to a collision, but this was based on the statements of the patients.

In her closing statement, the prosecutor argued that the defense witnesses were not reliable. Moua Xiong had significant memory problems. Linda Moua testified that she sat in the minivan until the police came, which would have been almost three hours after the collision, and this "just doesn't make any sense." She reminded the jury that the other driver involved in the collision described it as a "bump," and suggested that it could

_____

[7]This witness also used an interpreter.

15.

not have caused injuries requiring so much chiropractic treatment. "Use your common sense," the prosecutor said. "Do 7 people need 2 and a half months of chiropractor care from this?" In her rebuttal, she argued, "We don't know what [the injuries] were caused by. Quite frankly we don't know that they even exist .… They can't be x-rayed, we don't know."

### *Verdict and posttrial motions*

On October 12, 2010, the jury found Moua Xiong, Yer Thao Moua, Chou Xiong, and Linda Moua guilty of counts 1, 2, and 3.

Defendants filed a number of posttrial motions. On November 2, 2010, Linda Moua filed a motion for new trial. On March 9, 2011, Moua Xiong filed a motion for new trial. On March 14, 2011, Yer Thao Moua, Chou Xiong, and Linda Moua filed a motion for reconsideration of the denial of the motion for judgment of acquittal.[8] They argued that the prosecution presented no evidence about the identity of the front seat passenger. Four days later the same three defendants filed a motion for new trial.

A hearing on the motions was held on March 23, 2011. The trial court denied the motion for reconsideration in the following discussion:

> "THE COURT: Your position is that you didn't have to name exactly who was in the automobile as long -- because the gravamen of the crime is the false statements in order to obtain insurance proceeds.
>
> "[PROSECUTOR]: Correct, all members of the conspiracy together, then there are -- all members of the conspiracy are all guilty of the underlying crime if it is committed, which in this case it was. [¶]…[¶]

---

[8]As noted above, each defendant had her own attorney during the trial. By the time this motion was filed, defendants' current appellant counsel, Roger T. Nuttall, was representing Yer Thao Moua, Chou Xiong, and Linda Moua. Separate counsel represented Moua Xiong at the hearing on the posttrial motions. Now on appeal, Nuttall represents all four defendants.

"THE COURT:  I agree with the prosecutor's position in this matter, the crime is the insurance fraud, and so the [section 1118.1] I think was denied appropriately."

The trial court next considered the motion for new trial.  Nuttall described some of the witness testimony, emphasizing Yang's statement that there were several people in the car.  He concluded, "So my position simply is that there were more than two people in the [Hmong] vehicle, and as testified to, these people were injured, sought medical help for their treatment, had the medical bills paid, didn't recover a dime.  [¶] This does not import as fraud of any type, let alone insurance fraud."  The trial court denied the motion, explaining:

> "Ms. Yang did testify that she believed that there were other people in the car, and she did clarify that upon further examination as she got this feeling this was a typical [Hmong] car, and she had that feeling, but the jury chose to believe the particular witnesses who were there at the scene who looked at the car.  Their job was to look at the car and found -- and saw that there were two people in the car.  The jury believed that, and I agree with the jury.  [¶]  There is no basis for a new trial.… [Defendants were] ably represented at the trial."

### *Sentence*

The trial court proceeded to sentencing, granting each defendant probation for three years.  For count 1, each defendant was ordered to serve 180 days in county jail; for counts 2 and 3, no time was imposed.  In addition, the trial court ordered defendants, jointly and severally, to pay restitution of $8,396.86.

Each defendant filed a notice of appeal on April 5, 2011.  We consolidated the appeals by order dated August 6, 2013.

## DISCUSSION

### I.    Motion for Judgment of Acquittal

All four defendants contend that the trial court erred by denying their motion for judgment of acquittal at the close of the prosecution's case.  (§ 1118.1.)  We disagree.

17.

"'The standard applied by a trial court in ruling upon a motion for judgment of acquittal pursuant to section 1118.1 is the same as the standard applied by an appellate court in reviewing the sufficiency of the evidence to support a conviction, that is, "whether from the evidence, including all reasonable inferences to be drawn therefrom, there is any substantial evidence of the existence of each element of the offense charged."' [Citation.]" (*People v. Stevens* (2007) 41 Cal.4th 182, 200 (*Stevens*).)

The question "is simply whether the prosecution has presented sufficient evidence to present the matter to the jury for its determination." (*People v. Ainsworth* (1988) 45 Cal.3d 984, 1024.) We review the question independently. (*Stevens*, *supra*, 41 Cal.4th at p. 200.)

As to count 1, insurance fraud against Allied, defendants argue, "To prove that appellant's claim with Allied was false and fraudulent, the prosecution needed to prove either that appellant was not injured at all or, if she was injured, the injuries were not sustained in the underlying collision in this case. Such evidence was lacking at the time appellant made her 1118.1 motion."[9]

Defendants' position—that the prosecution was required to prove that each defendant's insurance claim for her own injuries was false—is not correct. Section 550, subdivision (a)(1) makes it a crime "to do … or to aid, abet, solicit, or conspire with any person to do" the following: "Knowingly present or cause to be presented any false or fraudulent claim for the payment of a loss or injury … under a contract of insurance." It was, therefore, sufficient for the prosecution to present evidence from which it could be inferred that defendants conspired to present a false claim or aided another in presenting a false claim.

---

[9]We have quoted the argument as it appears in the briefs for three of the four defendants. The wording of Moua Xiong's brief on this point is slightly different, but the argument is exactly the same.

18.

Here, the prosecution presented evidence that witnesses after the collision saw only two women get out of Moua Xiong's minivan and saw no one else inside the minivan (testimony of Mark and Vincent); all four defendants met together with Wadoua and asked him to make claims with Allied on their behalf (testimony of Wadoua); and claims were made for chiropractic care for all four defendants plus three children (testimony of Edwards). This was evidence from which a reasonable jury could infer that there were only two women in the minivan when the collision occurred and, consequently, at least five of the seven claims for chiropractic care were fraudulent.[10]

At the meeting with Wadoua, the two defendants who had been in the minivan during the collision would have known that the other two defendants had not been there and could not have valid claims, yet all four defendants together asked Wadoua to make claims for them. This was circumstantial evidence from which the jury could infer that defendants conspired together to make fraudulent claims (that is, the claims of the defendants who were not in the minivan and the claims for the three children). (See *People v. Vu* (2006) 143 Cal.App.4th 1009, 1025 ["[I]t is not necessary to establish the parties met and expressly agreed; rather, 'a criminal conspiracy may be shown by direct or circumstantial evidence that the parties positively or tacitly came to a mutual understanding to accomplish the act and unlawful design.'"].)

Furthermore, someone must have told the defendants who were not involved in the collision about the meeting with Wadoua and the opportunity to make fraudulent insurance claims. This too was circumstantial evidence from which the jury could infer

---

[10]In their reply briefs, defendants assert, for the first time, that any apparent conflict in the testimony regarding how many people were in Moua Xiong's minivan at the time of the collision was "illusory," suggesting that Yang's testimony conclusively proved there were more than two people in the minivan. "It is axiomatic that arguments made for the first time in a reply brief will not be entertained because of the unfairness to the other party." (*People v. Tully* (2012) 54 Cal.4th 952, 1075 (*Tully*).) In any event, defendants' new assertion is no more than an attempt to reargue the weight of the evidence.

that defendants together conspired to present fraudulent claims and/or one or more of the defendants aided and abetted other defendants in presenting fraudulent claims.

In addition, the prosecution presented evidence that the collision was minor and caused very little physical damage to the vehicles. Tracy testified that Moua Xiong's minivan "bumped" her van and she and her children were not injured in the collision. Witnesses at the scene testified that everyone said they were fine immediately after the collision, and a police officer testified that more than two hours after the collision an Asian man associated with the minivan reported it was a noninjury collision. Given the state of the evidence at the close of the prosecution's case, it reasonably could be inferred that the collision did not cause any injuries, and therefore all claims for chiropractic care for alleged injuries resulting from the collision necessarily were false.

Defendants next argue they were entitled to acquittal on count 2 because there was no evidence that any of them submitted a claim to Geico. They rely on the claim on Tracy's insurance being opened because Allied made a subrogation claim against Geico.

The prosecution was not required to show that defendants personally submitted claims to Geico. Section 550, subdivision (a)(1) makes it unlawful to "cause to be presented any false or fraudulent claim." Here, the evidence was sufficient for the jury to find that defendants caused the claims to be made to Geico. (See *People v. Singh* (1995) 37 Cal.App.4th 1343,1369-1370 [chiropractor who did not directly present fraudulent claims to insurers properly convicted of insurance fraud; sufficient that he sent fraudulent billings to attorneys, knowing billings would be forwarded to insurers].)

Defendants also claim the prosecution failed to prove counts 1 and 2 because, accepting the prosecution's theory that there were only two women in the minivan at the time of the collision, the identity of these two occupants was not established. Defendants posit that the two occupants of the minivan are "on a much different legal footing" from the remaining defendants because "the [insurance] claims of the two [mini]van occupants were not shown by the prosecution to be anything but proper."

20.

This claim fails for the reasons we already have discussed. First, the prosecution was not required to prove that each defendant's insurance claim was false; it was sufficient to present evidence that each defendant conspired to present a false claim or aided and abetted another to present a false claim. Second, at the close of the prosecution's case, the jury reasonably could have determined that no one was injured in the collision and, as a result, even the insurance claims made by the two occupants of the minivan were false.

As to count 3, conspiracy to commit insurance fraud, defendants contend the evidence of overt acts was insufficient to withstand the section 1118.1 motion.

"The crime of conspiracy is defined in the Penal Code as 'two or more persons conspir[ing]' '[t]o commit any crime,' together with proof of the commission of an overt act 'by one or more of the parties to such agreement' in furtherance thereof. (Pen. Code, §§ 182, subd. (a)(1), 184.)" (*People v. Swain* (1996) 12 Cal.4th 593, 600.)

Defendants challenge the sufficiency of the evidence for each of the overt acts alleged in the second amended information, but all the prosecution was required to show was a *single* overt act in furtherance of the conspiracy committed by *one* of the defendants. The prosecution met this burden by presenting evidence that all four defendants signed "power of attorney" documents intended to give Wadoua permission to make insurance claims on their behalf. If there were only two women in the minivan, then the signatures of at least two of the defendants furthered the conspiracy by allowing Wadoua to make false claims on their behalf.

In their reply briefs, defendants also argue, for the first time, that they could not be convicted of both the crime of conspiracy and the substantive crime of insurance fraud. Although we need not consider it, see *Tully*, *supra*, 54 Cal.4th at page 1075, this argument fails. Conspiracy is a distinct offense from the commission of the offense that is the object of the conspiracy, and a defendant may legally be convicted of both offenses. (*People v. Moore* (1956) 143 Cal.App.2d 333, 340.)

In summary, defendants have failed to show they were entitled to a judgment of acquittal as to any of the charges at the close of the prosecution's case. The trial court correctly denied their section 1118.1 motion.

## II.     Sufficiency of Evidence

Defendants Moua Xiong and Yer Thao Moua raise the additional claim that their convictions were not supported by substantial evidence. The defense presented evidence that Moua Xiong was the driver and Yer Thao Moua was in the front passenger seat at the time of the collision. Ybarra also testified that he provided treatment to these defendants (as well as the five other claimants). Moua Xiong and Yer Thao Moua argue there was no evidence to show they were not in the minivan and were not injured, and therefore an inference of guilt was not warranted.

This claim fails because it is premised on the incorrect assumption that a defendant can be guilty of insurance fraud only if it is proved that his or her own claim is fraudulent. As we have discussed, this is not the law; a defendant also is guilty of insurance fraud when he or she conspires with another to cause a fraudulent claim to be made or aids and abets another in making a fraudulent claim. (§ 550, subd. (a)(1).)

In reviewing a challenge to the sufficiency of the evidence, "[w]e presume in support of the judgment the existence of every fact the trier of fact reasonably could infer from the evidence. [Citation.] If the circumstances reasonably justify the trier of fact's findings, reversal of the judgment is not warranted simply because the circumstances might also reasonably be reconciled with a contrary finding. [Citation.] A reviewing court neither reweighs evidence nor reevaluates a witness's credibility. [Citation.]" (*People v. Lindberg* (2008) 45 Cal.4th 1, 27.)

Here, the evidence was sufficient to support a finding that all four defendants conspired to present insurance claims for persons who were not in the minivan at the time of the collision. The jury also was free to discredit Moua Xiong's testimony that she felt pain the day after the collision. (Yer Thao Moua did not testify). Moreover, regardless

22.

of Moua Xiong's credibility, in light of the evidence presented that the collision was minor, the jury reasonably could have rejected the inference that any pain experienced by Moua Xiong was caused by the collision.  Accordingly, Moua Xiong and Yer Thao Moua's convictions were supported by substantial evidence.

## DISPOSITION

The judgments are affirmed.


_____
CORNELL, J.


WE CONCUR:


_____
LEVY, Acting P.J.


_____
FRANSON, J.